IN THE UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 23-1125

Sines, et al, Plaintiffs vs.

Kessler, et al, Defendants

Civil Action 3:17-cv-00072-NKM-JCH

<u>PRO SE APPELLANT DEFENDANT CANTWELL'S OPENING APPELLATE
BRIEF</u>

<u>PRELIMINARY STATEMENT</u>

Filed concurrently with this brief is a conditional motion for leave to file in forma
pauperis, and for time to do so, in the event that Cantwell must provide a transcript
for the following to be considered. Cantwell is aware that his codefendants have,
and the Plaintiffs have actually published on their financier's website, transcripts
of the trial at issue, and only recently came to question if this would suffice for the
Court's requirements.

1

Even in the event that this proves incorrect, and the motion is denied, Cantwell respectfully requests the Court address those points raised below which do not require a transcript, of which he suspects there are several.

## ARGUMENTS

## 1. **The Jury Did Not Find A Racially Motivated Violent Conspiracy**

The primary thrust of Cantwell's argument is that Plaintiffs ought not be able to collect a consolation prize of hate speech reparations after suing for a racially motivated violent conspiracy. While the jury instructions may have been given an accurate description of Va. Code Ann. § 8.01-42.1 in their instructions, that Plaintiffs only needed to prove one and not all possible theories of liability on Counts 3 and 4 (racially motivated violence, intimidation, **OR** harassment), the Defendants, and Cantwell in particular, were sued for violence, not harassment.

The Jury found Defendants liable on Counts 3 and 4, but not 1 and 2. Counts 1 and 2 required a conspiracy to commit racially motivated violence. Counts 3 and 4 carried a harassment theory of liability. Suing people with unpopular political views for harassment because they held a public demonstration is fraught with peril for civil rights, and subject to greater scrutiny in the pretrial process for good reason. The Plaintiffs attempted to raise harassment claims in their initial complaint, and those were dismissed by the District Court. The surviving claims

2

were for claims of violence. If the Jury found the Defendants liable for harassment, then they held the remaining defendants liable for something they were not sued for, and the verdict cannot stand.

The fact that violence actually ensued is hardly dispositive of the point here raised. Defendants offered video evidence that Plaintiffs' associates initiated the violence, Cantwell offered evidence that he was stalked by Plaintiffs' associates in advance of the Events in dispute, and anybody with a television set or newspaper subscription has become all too familiar with Antifa riots in the five plus years since the event.

If the Jury had found a conspiracy to commit racially motivated violence, there would have been a verdict on Counts 1 and 2. Similarly, if, as Plaintiffs contend, and the District Court ruled, Defendant Fields's car crash was the overt act of the conspiracy of Count 3, the Jury would have had no trouble reaching a verdict on Counts 1 and 2. Since Fields (under threat of execution) pleaded guilty to intentionally striking Plaintiffs with his car out of racial animus, anyone who conspired with him to do such a thing would clearly have run afoul of Counts 1 and 2, and, like Fields, this lawsuit would be the least of their problems.

Instead, during jury deliberations and subsequent to announcing they had reached a partial verdict, the Jury asked the Court if "words are a form of violence". Having

been informed they were not, the jury announced they were deadlocked on Counts 1 and 2, returning verdicts of liability on the remaining Counts.

The implications here are very obvious. The Jury was happy to find the Defendants liable for the racially motivated harassment component of Counts 3 and 4 because they found the Defendants' political demonstration distasteful, and wanted them punished for their words. During deliberations one or more jurors said "Words are a form of violence" with the implication that words alone were cause to find on Counts 1 and 2 as well as Counts 3 and 4, and the less unreasonable people in the room drew a line they would not cross.

It would also be nonsensical to award $1 in compensatory damages from co-conspirators in a racially motivated homicide and assault, especially since Ms. Sines was awarded compensatory damages from Mr. Fields. Yet, her and Mr. Wispelwey were awarded $0 from the Defendants of Count 3. The other Plaintiffs were only awarded a token sum of compensatory damages in a (legally inadequate) attempt to justify the punitive awards, because there were no actual damages to compensate on Count 3. The Jury only sought to punish the Defendants for their demonstration. Not to compensate the Plaintiffs for harm done, because the words did no actual harm.

While Cantwell appreciates their restraint, he was not sued for harassment. He was sued for violence. Without a finding of a racially motivated violent conspiracy, Cantwell cannot be held liable for expressing views others find distasteful, much less for being in the company of others who express those views.

This renders the verdict on Counts 3 and 4 a violation of Cantwell's First Amendment rights and an unconstitutionally vague application of the law.

Furthermore, no evidence presented at trial offered the hint of the suggestion that Cantwell ever uttered a word to any Plaintiff, or told anyone to say anything to anybody, or that anyone ever told Cantwell anything about harassing anyone. On the contrary, Cantwell urged his followers not to call attention to themselves in a blog post in evidence as Defense Exhibit 024A. Saying; "*For this event, I encourage those with the legal authority, to carry a concealed rearm. **Open carry will draw more unnecessary attention to us**, so if*

*you do not have a license to carry, please secure your firearms elsewhere and let us worry about defense.*"

It would be a terribly repetitive exercise to go through the complaint and the Court's decisions in this case seeking every example of the Plaintiffs alleging and the Court deciding that this case was entirely about violence and not speech, but the following may suffice.

5

In Judge Moon's July 9th decision denying Cantwell's motion to dismiss, he said the following about Cantwell;

*While Defendant Cantwell may have been lower in the pecking order than either Kessler or Spencer, he is more closely tied to acts of overt violence in furtherance of the conspiracy than either of them.*

And;

*He was later charged "with two felony counts of illegal use of tear gas and one felony count of malicious body injury by means of a caustic substance. He was indicted on December 4 on a felony charge of illegal use of tear gas." (Id. at ¶22).* ***This conduct, of course, is not protected by the First Amendment.***

And;

*In light of the specific statements made by Cantwell, the picture of him assaulting counter-protesters with pepper spray, and his joint leadership of various portions of the events with other Defendants (e.g., the Friday night march, the Daily Stormer's encouragement for its followers to get "behind" him), Plaintiffs have plausibly alleged that Defendant Cantwell joined the conspiracy to engage in the racially motivated violence at the "Unite the Right" events.*

There is nothing in that decision about Cantwell conspiring to harass anyone, and notably where harassment is mentioned, the Court rejected Plaintiff Pearce's 1982

6

claim that Defendants violated her civil rights by walking past Congregation Beth Israel. The Court also dismissed claims pertaining to Defendant Invictus walking past Wispelwey's gathering for the same reason. Plaintiffs never alleged, plausibly or otherwise, that Cantwell harassed or conspired to harass anybody, and had that been the argument they were making, it would have been tossed on First Amendment, failure to state a claim, and other grounds.

Similarly, when Cantwell moved for Judgment as a Matter of Law at the conclusion of Plaintiffs' case, Judge Moon denied the motion by stating, in relevant part;

*The Court considered the Rule 50 motions raised by Defendants Cantwell and Spencer raised in argument on November 16, 2021, and in Defendant Spencer's subsequently-filed Rule 50 motion (Dkt. 1451). For the reasons set forth on the record, the Court concluded that neither Defendant Cantwell's nor Spencer's motion had established that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs on the issues raised.* ***Rather, Plaintiffs' evidence had raised a jury issue whether Defendants Cantwell and Spencer had conspired to engage in racially motivated violence.***

The jury issue raised was a question of racially motivated violence. It was never a question of harassment. The Court has always understood this. Cantwell cannot be

found liable for something he was not sued for, and which would violate his First Amendment rights.

## 2. **One Cannot Harass, or Conspire To Harass, One He Seeks To Avoid A Confrontation With**

Moreover, it is not harassment to hold a demonstration in secret, or to attend a permitted demonstration, just because Plaintiffs and their co-conspirators went out of their way (by way of deception) to discover that secret, and seek a confrontation with those demonstrators.

Undisputed evidence was offered at trial that the Defendants' events of Count 4 from the evening of August 11th were meant to be kept a secret, and that Plaintiffs' associates must have discovered the events by surreptitious means. Every Plaintiff denied knowing who told them about the events, which was obviously untrue as expanded up on below.

Even if Plaintiffs were offended, or even they were treated poorly, even if they were so traumatized as to require an "emotional support animal" by the words they heard, after obtaining what they sought, that is not the fault of anyone but the Plaintiffs themselves. The Plaintiffs knew what the Defendants were gathered to say, and because of this knowledge Plaintiffs sought a confrontation, against the wishes of Defendants.

8

Defendants tried to keep the August 11th march on University of Virginia a secret. This secret was only discovered because the Plaintiffs' associates spied on Defendants' communications channels against Defendants' wishes. Neither Willis nor Romero were willing to tell the jury who told them about the demonstration.

One cannot harass his stalker. That's not how harassment works.

If anything, the Plaintiffs set out to harass Defendants over their political views, and however unpleasant that experience turned out to be for them, the Court ought not have rewarded *their* search for conflict.

### 3. **Cantwell Did Not Racially Harass Or Assault Any Plaintiff on August 11th, or at any other time, and Count 4 Contains No Conspiracy Element to Hold Him Liable for the Actions of Others.**

While Cantwell did plead guilty to two misdemeanors for his conduct on August 11th, no portion of that plea had anything to do with any Plaintiff in this case, nor was there any element of racial animus to his plea.

Video showed that Cantwell deployed pepper spray and his hands against able bodied white adult male rioters, *after* they were rioting. At no point did Cantwell say or do anything to Willis or Romero, nor was this ever factually alleged.

**Cantwell and Mr. Willis on August 11th.**

Under cross examination by Cantwell, Willis stated that he "had reason to believe" he was affected by Cantwell's pepper spray "among others", but upon further examination, this purely speculative claim fell apart. Willis did not allege this in the complaint. He did not say it in his deposition. It was not supported by video. His Counsel did not ask him whose pepper spray he was affected by during direct examination, even though Mr. Willis stated that he told his legal counsel of this possibility subsequent to his 2020 deposition almost three years after the events.

This speculation entered the record of this case for the first time under Willis's cross examination by Cantwell, and Willis stated he only thought of this possibility several years later after the event when he saw a highly publicized photograph of Cantwell pepper spraying someone else. This is indicative of the Plaintiffs' making it up as they go along, and becoming overly confident in the District Court's accommodation of their deceptions.

From Cantwell's cross examination of Willis; (Emphasis Added)

106 D. Willis – Cross

Q To the best of your knowledge -- withdrawn. When you said that my pepper spray was on your side, are you saying that I pepper-sprayed you?

A I'm saying that **I have reason to believe** that the pepperspray that I choked on and that I needed to flush my eyes out because of came from you, **among other people**.

Q Did you talk to Commonwealth's Attorney Robert Tracci about that?

A I don't know who that is.

Q Did you speak to a Commonwealth's Attorney about your injuries?

A I don't think so.

Q Did you speak to the police about your injuries?

A No.

Q Okay. Why not?

A I was really busy that weekend. I didn't think -- I never made the time to go file a police report. It seemed like they were aware of what was going on.

Q Did you hear any news stories about me being prosecuted for what happened that night?

A I don't think I've heard those stories.

Q So it's your testimony today that you have not heard those stories?

A If you were prosecuted for something that happened that night, I only know about it because you might have mentioned it earlier in these court proceedings. That's it.

Q So before today, you've never heard that Christopher Cantwell got prosecuted for anything that happened in Charlottesville?

A I think you mentioned that you had some prosecution over something between you and someone else in the Walmart parking lot or something.

Q Just to be clear, I'm talking about, before we walked into this courtroom, you had no idea that Christopher Cantwell was prosecuted for anything that happened in Charlottesville that weekend?

A That is my understanding, yes.

**Q Okay. Before today, did you tell anybody that you choked on Christopher Cantwell's pepper spray?**

**A Yes.**

**Q Who?**

**A My legal counsel.**

**Q They didn't ask you about that during your direct examination. It seems like a relevant detail. You're suing me, right?**

**A Oh, no. It's just that, like, I don't think I had seen the photo until after the deposition or something.**

Q I'm sorry. After the deposition?

A Yes.

Q So you saw the photo after your deposition?

A Yes. Yeah, I continued to see photos.

Q And then after you saw the photo, you said, wait a second, I think Cantwell pepper-sprayed me?

A Could you let me finish my answers, please?

12

Q I apologize. Please do.

A Could you repeat your question?

Q The first time you saw me was after your deposition?

A The first time I saw you?

Q Yeah.

A In person?

Q Well, the photograph in question.

A Oh. I don't know if it was the first time, but just the incident that I remember, when you asked me about it.

Q Do you remember what the date of your deposition was?

A Sometime in July of 2020.

Q So in June of 2020, if somebody said, "do you know who Christopher Cantwell is," you would have said no?

A I don't remember when I first became aware of you. I may have had -- I don't know. Like, I may have had the ability to identify you. I had never looked at footage and events from 8-11 too closely, because I tried to avoid them unless it's pertaining to this case.

Q Okay. When were you approached by -- when were you approached about this lawsuit?

A I became a plaintiff in October of 2017, if I'm not mistaken.

Q So pretty early on in the process, right?

A I think so. I really hardly remember the time period. That's, like, peak -- well, yeah.

Q I can't help but notice that you say "I don't remember" a lot. Is everything okay?

A No, everything is not okay.

Q Okay. Is that something -- the memory gaps, did they form after August 11th?

A Yes.

Q So prior to August 11th, mind like a steel trap, and then afterwards you can't remember who you're in a car with or what sex they are?

A My memory -- my ability to remember things and to concentrate and to be present was so much better before August 11th and 12th. I think going through something that traumatic at 18, yeah, it really affected me.

And I also have tried to -- tried very hard to, like, let go of certain memories from this period in my life. It was horrible. All of 2017 was horrible.

End of Transcript.

Willis's frequent memory problems, and evasive answers, combined with his statement that he came up with this purely speculative idea three years later based on a photo of Cantwell pepper spraying someone else, in which Willis is not seen, render his speculation about who pepper sprayed him evidentially useless. Willis had other credibility problems which will be addressed in greater detail later, and video does not capture Willis being pepper sprayed by Cantwell.

Cantwell did not assault Willis, Willis never stated as fact that he did, and even if the Court were to make this leap, Cantwell deployed his pepper spray at white men who were being violent. It is not even alleged that Cantwell targeted Willis, or any other member of a protected group. Cantwell's entirely uncontested and video corroborated testimony was that he was motivated by the violent behavior of the white men he engaged. Video shows Cantwell only engaging white male combatants. The idea that Cantwell was so driven by racial hatred that he diligently avoided the black and transgender non-combatants defies reason. Even if Cantwell's pepper spray did affect Willis, of which there is no evidence, Cantwell cannot be held liable for this under Va. Code Ann. § 8.01-42.1 because racial animus was clearly not his motive and he did not target Willis.

Additionally, whatever the legal implications of his time served misdemeanor plea agreement, Cantwell was acting in self defense, and the people who caused him to so act would be the ones responsible for any resulting injuries. Even if the Court finds that Cantwell's plea agreement negates a claim of self defense, even if the Court finds that Cantwell totally exceeded the legal boundaries of self defense, Cantwell's video corroborated and uncontested testimony as to his mindset was that he was acting under this justification, which keeps him far afield from liability under Va. Code Ann. § 8.01-42.1, as the statute requires him to act with racial animus.

15

Mr. Willis does not allege that Cantwell or any other Defendant spoke a single word to him on August 11ᵗʰ or at any other time. Mr. Willis testified (implausibly) that he had no idea who Cantwell was until much later. So, a harassment theory of liability with regard to Cantwell and Willis, even if that were the subject of this litigation, cannot apply here.

Absent a conspiracy element, Cantwell cannot be held liable for the words or actions of others, whom Willis sought confrontation with, against the wishes of the Defendants.

**Regarding Ms. Romero on August 11ᵗʰ**

In an apparent effort to pick up where Mr. Willis left off, Ms. Romero offered the speculation that Cantwell might have hit her during her direct examination by Cantwell. Like with Mr. Willis, this speculation fell apart under further examination, and was unsupported by video evidence. No evidence was offered that Cantwell ever spoke a word to Romero.

Transcript of Cantwell's direct examination of Romero; (Emphasis Added)

59 N. Romero – Direct

A More. You can go back more.

Q Sure. How far back?

(Video playing.)

A Right there. Is that you?

Q That's me hitting this guy.

A Right. But right before then, there's a couple of hits –

Q Hits what?

A We're, like, right next to this person. So we're getting a bunch of those hits.

Q So you're telling me that I punched you; is that your testimony today?

A I'm just telling you that I see you in this video.

Q I'm in the video. Are you telling the jury that I punched you?

A Go back. Play it in slow motion.

**Q Are you telling the jury that I punched you? Yes or no?**

**A I cannot confirm that, but if you go back –**

Q Are you telling the jury that I punched you?

A I said I cannot confirm that, but if you play that again in slow motion --

**Q Before today, you've never testified that I punched you, right?**

**A No, but you're showing me this video now.**

Q I'll play this video 100 times if you want. I'm asking you if you ever told anyone that I punched you before today?

MR. MILLS: Your Honor, argument between counsel and the witness.

**THE COURT: Sustained. But she needs to answer the question. Did he punch you?**

**THE WITNESS:** I didn't say that.

**THE COURT:** Okay. Well, did he? Say yes or no.

**MR. CANTWELL:** I'll put the video in slow motion. How about -- can we put --

**THE COURT:** Well, let's get it straight: Did Mr. Cantwell punch you?

**THE WITNESS:** I never said that he punched me.

**THE COURT:** I didn't ask you did you say it.

**THE WITNESS:** No, Judge.

**THE COURT:** Did he? Did he punch you.

**THE WITNESS: I can't confirm that, but it looks like in that video that he's right next to us, and so that's why I was wondering if he could run it back.**

THE COURT: Okay. Well, that's all right.

**THE WITNESS: Because I don't know who's hitting on us that day.**

BY MR. CANTWELL:

Q Without saying who punched you, where did you get punched and how many times?

A I can't tell you. It all happened so quick. But we were taking hits.

**Q On what part of your body were you punched?**

**A I can't say that I was punched, like, on site, but we were getting, like, sideswiped by the fight that was happening right next to us.**

**Q So just so we're clear, were you punched or not?**

18

**A I said that we were hit. I'm not sure I was punched directly.**

Q Okay. Because you asked a question, which was: "Did you just punch me?" That's what you said.

MR. MILLS: Objection. That's not a question. This should be an examination by counsel.

THE COURT: Overruled.

We'll get this straight. I think she's said now --she's answered the question.

BY MR. CANTWELL:

Q So before today, how many people did you tell that you got punched?

MR. MILLS: Objection. That's not her testimony. She clarified this, Your Honor.

THE COURT: He's asked her that question. She can answer the question.

BY MR. CANTWELL:

Q Before today, how many people did you tell that you got punched on August 11th?

A I said that we were hit by the fight. I didn't say I was punched directly. I'm also only saying that because you're showing me this clip, and that looked like you, and that's us running away. So that's all I brought that up for.

Q All right. So I've got the video in slow motion. Let's try to figure out if I hit you. Sound good?

(Video playing.)

Just while we're at it, that guy in the blue shirt who's getting punched by all those guys, do you know who that man is?

19

A No.

Q Okay.

(Video playing.)

A This is when they start, like -- are you watching that?

MR. MILLS: Is there a question pending, Your Honor?

MR. CANTWELL: We're waiting to find the part where I punch Ms. Romero. So if that's the part, let me know and I'll rewind.

**MR. MILLS: Objection. She clearly testified she did not say you punched her.**

MR. CANTWELL: Okay. So should we move on to something else, then?

THE COURT: Yes. I mean, that's the whole –

End of Transcript

Ms. Romero was never touched by Cantwell or any other Defendant. She never even alleged that she was. She didn't even get "punched" but rather claims she was supposedly "sideswiped by the fight" (though none of the video corroborates this claim) that broke out after the people she chose to associate with, while seeking confrontation with the Defendants who tried to avoid her, attacked the Defendants. Absent a conspiracy element, Cantwell cannot be held liable for whoever accidentally bumped into Ms. Romero while her friends were attacking the Defendants.

20

Ms. Romero never testified that Cantwell or any other Defendant said anything to her. So theories of liability of harassment, even if they were the subject of this litigation, cannot apply to Cantwell and Romero on Count 4. Without a conspiracy element, the Defendants cannot he held liable for the words of unnamed others.

The issues of Cantwell's motivations already explained with regard to Mr. Willis also apply to Ms. Romero. She does not claim she was targeted at all, much less on the basis of her race, and certainly not by Cantwell. She was in the company of violent white men who started a fight, and she claims to have been "sideswiped" as a consequence of their unlawful behavior.

That the violent behavior of Ms. Romero's associates motivated Cantwell to use force against them does not create any coherent or plausible theory of liability under Va. Code Ann. § 8.01-42.1.

4. **The Fact That These Questions Are Even Plausible Renders This Application Of Va. Code Ann. § 8.01-42.1 Unconstitutionally Vague**.

Acknowledging from experience that two people can see the same facts and evidence and reach different conclusions about their meaning in good faith, let us entertain the possibility that the jury could have found the Defendants liable for racially motivated violence on Counts 3 and 4 without Counts 1 and 2. Let us

21

further entertain the possibility that despite all prior conclusions in this case, a harassment theory of liability could attach.

The fact of the matter is, under those circumstances, we can't know what the jury found the Defendants liable for, because their instructions said the Defendants could be found liable for violence, intimidation, or harassment. This may be an accurate description of Va. Code Ann. § 8.01-42.1, but it tells us very little about the verdict.

The Plaintiffs argue there is a conspiracy to commit racially motivated violence, the Defendants deny the allegation. There is circumstantial evidence that the Plaintiffs claim is proof of a racially motivated violent conspiracy, and the Defendants offer wholly innocent explanations for that evidence. The verdict seems to indicate a theory of liability not involving a racially motivated violent conspiracy, given the lack of liability on Counts 1 and 2.

We know for certain that there is no evidence, not even any allegation, that any Defendant spoke to or touched Romero or Willis on August 11th, and yet the jury found liability on Count 4. The Jury even went so far as to award compensatory damages comparable to those offered to Ms. Romero for being hit by an allegedly weaponized vehicle.

The Plaintiffs themselves argued that Mr. Kessler can be held liable for harassment on Count 4, when confronted with the fact that Kessler harmed nobody. This, even though Count 4 lacks any conspiracy element, and Kessler is not alleged to have spoken a word to Romero or Willis. They seem to be offering a theory of liability that the event itself was harassment, and every participant is liable just for being there. This is legally nonsensical, but it is exactly the Plaintiffs' motivation for disrupting Defendants events in the first place, and demonstrates the true purpose of this vexatious litigation.

The Plaintiffs simultaneously argued that Cantwell should be held liable for violence on Count 4, even though he is not alleged to have touched or spoken to any Plaintiff on that night.

But Cantwell and Kessler were found equally liable on Count 4. Are we to conclude that the jury finds racially motivated violence and harassment equally troubling? Shall we conclude that words and assault are equal?

One may hope any 11 registered Virginia voters would at least fail to agree on something so preposterous (as these jurors apparently did on Counts 1 and 2). Violence and harassment are worlds apart in terms of law, and in their impact on victims. It boggles the mind what motivated the legislature to lump them all in

together in one statute, as if lawmakers were known to be shy about spilling ink over civil rights.

It will be argued later that the damages are unreasonable. The Plaintiffs already argued that Defendants' conduct was so outrageous that the District Court should have ignored the plain text of the law limiting punitive damages. The District Court rejected that argument, and the Plaintiffs cross appeal the District Court's decision now, without merit.

Without a certain determination of whether the Defendants were held liable for violence or harassment, how is the Court to determine this vital question?

It may be said that the time to raise this argument was when dealing with jury instructions, and in hindsight, perhaps the lawyers, on both sides, should have seen this coming. But Cantwell is not a lawyer, and all of the pre-trial conclusions of this litigation were based on the assumption that the violations of Va. Code Ann. § 8.01-42.1 simply followed from the implications of Counts 1 and 2.

Had there been a verdict on Counts 1 and 2, we would all be under assumption that the liability on Counts 3 and 4 were for violence, because that is what all the assumptions of the case were based upon. Indeed, though the Plaintiffs argued post trial (though not during or prior) that Kessler should be held liable for harassment on Count 4, they claimed victory in a post trial press conference stating that

Defendants were held liable for violence. Without that finding of Counts 1 and 2, if we assume that violence could be found on Counts 3 and 4 without that finding, we are left to guess whether they mean to deceive the Court or the Public. All we know for certain is they are not being forthright.

This is especially important with regard to the punitive awards. Punitive damages are meant to punish Defendants, but the Defendants are left without the vaguest idea what they are being punished for.

Courts are not in the business of playing guessing games. The verdict as rendered either means the Defendants were held liable for harassment, or leaves it uncertain as to what theory of liability applies to the Defendants. For these reasons, the verdict cannot stand.

5. **The Court's Jury Instruction Was Not Sufficient To Overcome the Prejudice of Cantwell Being Excluded From Depositions By Plaintiffs' Misconduct**

Cantwell was arrested on unrelated charges shortly after becoming a pro se Defendant in January of 2020. He was held without bail at the Strafford County House of Corrections in Dover, New Hampshire.

Immediately after Cantwell's arrest, Plaintiffs' counsel informed the District Court of the event. They followed the proceedings closely, and filed numerous briefs with the District Court informing them of every stage of the case.

Cantwell informed the Court of his change of contact information, which was necessary for him to be kept apprised of the proceedings. The District Court appropriately began sending correspondence in the case to Cantwell at the jail.

But the Plaintiffs continued sending all litigation correspondence to Cantwell's email address, which they knew full well he could not check.

When they were caught, more than a year later, Plaintiffs' counsel argued this was just too many cooks in the kitchen, and that the army of experienced litigators just lost this vital detail in the shuffle of so many of them working on the case. But it is less plausible, not more plausible, that many experienced litigators all made the same clerical error than if only one had done so.

Cantwell moved to sanction the Plaintiffs for their misconduct, and the Court denied the motion claiming that this somehow did not prejudice his Defense.

Among the many ways in which Cantwell's defense was prejudiced by this misconduct, was that witnesses were deposed without his being notified, and those depositions were used against him at trial.

The Court purported to remedy this with a jury instruction, but this instruction was glaringly insufficient to remedy the prejudice.

So obvious is this fact, that the Plaintiffs included testimony specifically mentioning Cantwell in their deposition designations from Kline, Hopper, Rousseau, and Pistolis. None of which were admissible against Cantwell. They knew full well that the jury could not compartmentalize this testimony, so they included it knowing it was inadmissible against Cantwell anyway.

Since Cantwell had never seen these depositions, and was preparing for trial during trial on account of his being denied access to trial materials for over a year and shuffled between five different correctional facilities pre-trial, stripped of his papers each time, he did not prioritize going through depositions that were inadmissible against him to discover this fact. Cantwell found out at the same time as the jury that witnesses he could not question were providing inadmissible testimony against him.

Moreover, Cantwell was accused of participating in a conspiracy, and on Count 3, was found liable for conspiracy. Evidence of the alleged conspiracy existing is evidence against Cantwell. There is no compartmentalizing this.

If the Court does not dismiss the claims outright, or order a new trial for all

Defendants, it must order a new trial on the grounds that Cantwell was denied the

right to confront witnesses against him.

## 6. **Cantwell's Objection To The Plaintiffs' Motion To Sever Did Not Waive His Due Process Objections Or Motions To Continue.**

Subsequent to Cantwell' arrest in January of 2020, Cantwell requested documents

be provided to him, including the complaint. It was not provided.

In March of 2021, it was discovered that Plaintiffs had continued sending all

correspondence in this case to Cantwell via email they knew he could not be

reached at, even after they repeatedly updated the Court on every stage of his

criminal proceedings.

Upon this discovery, Cantwell moved to sanction Plaintiffs for their misconduct.

The Plaintiffs sent Cantwell a 2 Terabyte encrypted hard drive at the Strafford

County Jail, and Cantwell notified the Court that this combined with the conditions

of his confinement made going through all of this material impossible.

The Court denied Cantwell's sanctions motion, stating that this somehow did not

prejudice his defense. It very clearly did.

This is particularly relevant to Plaintiffs' "expert" witnesses. Cantwell only learned of these witnesses when he received the Court's decision on his codefendants' motions to exclude them. Cantwell then told the Court he had to alter his defense strategy if they were to be admitted, because this testimony shifted the burden of proof. Cantwell told the court that he wanted to depose (among others) Thomas Massey, who started the fighting at University of Virginia, and Emily Gorcenski, a proud Antifa criminal who lied under oath to see him arrested. Cantwell had these and other witnesses on his witness list. He moved the court to compel their testimony. The Court was unable to do this due to their distance from the Court.

To make matters worse, Cantwell was subsequently transferred to the Corrections Corporation of America facility in Tallahatchie, Mississippi. There, Cantwell informed the Court that he had been stripped of the hard drive and all of his papers, that the light in his cell was broken, that he had only a golf pencil to write with, and that the facility would not allow him to receive the hard drive unless it came from his attorney.

Cantwell tried to explain the meaning of "pro se Defendant" to the facility staff, but before he could exhaust administrative procedures, he was shipped to the United States Penitentiary in Marion, Illinois a month later.

Promptly upon reaching USP Marion, Cantwell again informed the Court of his change of contact information, and stated that he had once again been stripped of all his papers, and that the conditions of his confinement, 23.5 hour lockdown in a COVID quarantine at the time, made his participation in this litigation impossible.

Cantwell then received a proposed trial schedule, which Cantwell objected to on the grounds that he had not been consulted, that the proposal stated it would be assumed all had consented if they did not object before the date Cantwell received it, and that the conditions of his confinement made trial preparation impossible.

The Court approved the schedule, noting Cantwell's objection.

After leaving COVID quarantine, Cantwell became aware of severe restrictions placed upon him by the Communications Management Unit (CMU) at USP Marion. These conditions prejudiced his defense, and he informed the Court of them in subsequent motions.

Cantwell made arrangements to have Plaintiffs' hard drive delivered to him at USP Marion. USP Marion held the drive in their possession for weeks before giving it to Cantwell, and subsequently gave him limited access to the drive on a computer that would not allow him to save or edit files. Nor would they permit his "lay counsel", Bill White, into the computer room with him to assist in reviewing the

materials. Cantwell's only means to review the materials outside his limited access to the computer was to write things down by hand and take them back to his cell.

Cantwell asked Plaintiffs' counsel to provide paper copies of documents so he could have time to review them outside of his limited computer access, he subsequently moved the Court to compel this production. The Court did not respond before Cantwell was moved for trial, and subsequently denied the motion as moot. The motion was anything but, moot.

Plaintiffs did produce hundreds of pages of documents, including (finally) the complaint, and Plaintiffs' responses to interrogatories. USP Marion staff acknowledged receipt of the materials, but said that Cantwell would not be able to view them until they had been reviewed by CMU personnel, and that even after this, he would only be able to view them in the presence of a staff member in an office not near the computer or the typewriters or any other prisoner.

Cantwell subsequently moved for a 1 year continuance, detailing his many travails.

The documents were finally shown to Cantwell in October, the day before he was shipped to Virginia for trial.

When Cantwell was ordered to pack his property before being moved, he asked how he was supposed to bring the hard drive and his legal papers with him. He was told that he could not. When he said that he had to, he was told to ask Intelligence

31

Research Specialist Kathy Hill in writing to ship the materials to him. This would not get a response before he was to leave.

Cantwell packed his legal materials in a separate box from the rest of his property, and marked it as "legal work". Cantwell wrote to Ms. Hill, requesting the box be shipped to him, though noting that he had no idea where he was being shipped to or when he would arrive. Hill never shipped the materials.

Cantwell was then shipped to the county jail in Grady County Oklahoma, and given no clue as to when he would leave. Cantwell again informed the Court of his change of contact information, and Plaintiffs' good friends in the US government kept Plaintiffs' counsel apprised, allowing Cantwell to attend the deposition of Benjamin Daly. Cantwell also informed the Court that the Grady County Jail would not grant him access to computers, that he was once again stripped of all his papers, and that he had nothing but a golf pencil to write with.

Two weeks later, Cantwell was again stripped of all his papers, and shipped, ultimately, to the Central Virginia Regional Jail (CVRJ). There, he once again notified the Court of his change of contact information, that he had again been stripped of all his papers, did not have access to computers, and was limited to a "flex pen" that barely worked, to write with.

32

Upon coming into Court, the Court asked if everybody was prepared for trial, and Cantwell stated that in no uncertain terms, he was not prepared, and that he had repeatedly over the course of months informed the Court of why this was the case. Cantwell stated that his due process rights were being violated by this state of affairs, and all of a sudden, people started to take his complaints seriously.

On the eve of trial, Plaintiffs' Counsel Mr. Bloch got a message to Cantwell at the CVRJ asking Cantwell to call him. Cantwell did call, and over the phone, Mr. Bloch read aloud his motion to sever the trials, and Mr. Kolenich's opposition to that motion. Cantwell subsequently learned that Mr. Smith had likewise opposed the motion.

With no time to consider or research the matter, Cantwell joined his codefendants in opposing the motion, and wrote out what little response he could from his memory of it, using his "flex pen". Cantwell stated that this moment arrived as a predictable consequence of his prior complaints being ignored or dismissed, and that this prejudiced his defense in a manner not resolved by the motion to sever.

Specifically, that if the Court would not remedy the misconduct of Plaintiffs and his captors, then all this would do is strip him of what little benefit he gained by having codefendants who were not being prevented from participating, and prolong the abuse Cantwell was suffering by Plaintiffs' abuse of process.

It would also have the effect of rewarding Plaintiffs for their misconduct, and for the misconduct of those who improperly acted to assist them by interfering in Cantwell's litigation. Allowing the Plaintiffs a still further head start, and the opportunity for a practice run at his codefendants before trying Cantwell, would have granted Plaintiffs an even more unfair advantage than they had already obtained through their misconduct.

Cantwell offered an alternative solution. The Plaintiffs could drop, or the Court could dismiss without prejudice, the Plaintiffs' claims against Cantwell, and the Plaintiffs could refile their suit against him alone.

The Court rejected this alternative, and gave Cantwell a binary choice. Proceed now or sever. Cantwell maintained his objections, along with his codefendants, by stating "given that binary choice, I'll proceed."

Plaintiffs' Counsel Roberta Kaplan said that "as far as we're concerned" Cantwell waived his prior objections. The Court incorrectly stated that Cantwell consented to move forward, when he was only choosing between two options which violated his due process rights.

A District Court cannot compel Cantwell to choose from a menu of which of his due process rights will be violated, simply to cover up the misconduct of those who persecute him for his political views. Cantwell had every right to be kept apprised

34

of these proceedings, which the Plaintiffs (negligently, at best) failed to do. Cantwell had every right to demand that the government stop interfering in this litigation. Cantwell had every right to demand a continuance when those rights were repeatedly and egregiously violated, and the Court refused to act. Cantwell had every right to object to the severance, as did his codefendants. Cantwell never waived his rights by expressing a preference for one violation over the other, when the Court made him choose between the two. Cantwell's rights were violated. Cantwell's defense was prejudiced. Cantwell did not get a fair trial. Cantwell cannot be held liable for harassing people who stalked him due to the verdict of an unfair trial.

If the Court declines to dismiss this case outright, or to order a new trial for all Defendants, it must order a new trial for Cantwell based on these violations of his rights and the prejudice those violations caused to his defense.

## 7. Plaintiffs' Experts Should Have Been Excluded, Especially Against Cantwell.

As briefly touched upon above, Cantwell did not even find out about Plaintiffs' experts until the Court ruled against his codefendants' motions to exclude them.

This testimony shifted the burden of proof in the case, by making ideology itself the conspiracy. Their testimony could fairly be summarized as stating that visiting

35

misery on non-Whites was the whole point of Defendants' political views, and that lawful activity was simply in furtherance of this cartoonish depiction.

When Cantwell discovered this, he promptly notified the Court that it altered his Defense strategy such that he would need to depose other witnesses and discover other evidence to combat this fictional narrative. Then, as described in detail above, he was prevented from doing so by the conditions of his confinement and repeated transfers. His attempt to get those witnesses into the courtroom to question them at trial were thwarted by their distance therefrom.

Plaintiffs' (at best) negligent failure to notify Cantwell of these experts, combined with the conditions of his confinement left him no opportunity to find a rebuttal witness, or obtain the testimony and discovery necessary to combat their narrative. This inexcusably prejudiced Cantwell's defense specifically, and if the Court declines to dismiss the case outright, or order a new trial for all Defendants, it must order a new trial for Cantwell to correct this injustice.

Moreover, the testimony of Plaintiffs' experts proved more prejudicial than enlightening, as Cantwell's codefendants predicted. There was no code to break. There were no secret handshakes to be explained.

Simi's purpose seemed to be little other than to call the Defendants violent racists, and to improperly introduce hearsay from a Jewish man pretending to be a Nazi.

36

This was the Daily Stormer article "Operational Security for Right Wing Rallies" by Andrew Alan Escher Auernheimer, aka "weev", After commenting at length about the article's instructions for destroying and hiding evidence on direct, Simi testified that Auernheimer was Jewish under Cantwell's cross examination. This discovery outraged Plaintiffs' counsel, which they said was "beneath the dignity of the Court" in an effort to keep it secret from the Jury.

Blee's testimony seemed designed to do little more than conjure images of the Holocaust in the minds of the jurors, so as to remind them of the supposed horrors that would ensue of Defendants were allowed to participate in our political system, as is their right.

This testimony was improper, and should have been excluded before trial. Now that we have seen it and its outcome, the Court should order a new trial to correct this error, in the event it declines to dismiss the claims outright.

## 8. The Jury Likely Acted Based on Improper Passion and Prejudice.

Plaintiffs' case was racially charged, and could hardly have been better designed to inflame the passions of jurors. The Defendants' political views were discussed more than any other single feature of the case, and given the meticulously designed racial makeup of the jury, the stage was set for such an outcome.

Plaintiffs struck exclusively white jurors, and raised a meritless Batson challenge when Defendants struck a black juror based on nothing other than the Defendants' political views. The Court's refusal to decide against the Plaintiffs in the moment left Defendants walking on eggshells for the remainder of jury selection, sure that if any black juror was struck, they would end up with both jurors they meant to strike and none of the strikes to otherwise utilize.

The jury also consisted of an open Antifa sympathizer who said that political violence was sometimes acceptable, despite Defendants' motion to strike this juror for cause. The same juror also managed to avoid being peremptorily struck, because the Court refused to strike for cause another who could arguably have been a Plaintiff himself. Cantwell regrets that his access to trial transcripts is limited to what Plaintiffs' financiers posted on their website, and that this lacks the jury selection phase. Otherwise, he would be more specific.

That the jury asked if "words are a form of violence" during deliberations tells us so much about this. Such a concept is not the product of a rational thought process. It is passion at best, and more likely, as Defendants warned during jury selection with our Antifa sympathizer, the product of political extremism. Lady Justice is surely less injured by this verdict than she would have been had all the jurors agreed with this ideology, but she needs this court to mend her wounds still.

The Jury agreed the Defendants speech was enough to find them liable on Counts 3 and 4, but did not agree that there was a conspiracy to engage in racially motivated violence to hold them liable on Counts 1 and 2. This alone is indicator enough that the jury acted on an improper motive, and the verdict should be set aside in its entirety, or at a minimum, on Counts 3 and 4.

## 9. The Court Should Order a New Trial Due To Incredible Testimony

At the time of the Court's decision on Cantwell's Rule 50 motion at the conclusion of Plaintiffs' case, the Court noted it could not at that time make judgements about witness credibility.

The time for that judgement has come, and since the Court is entirely too well aware of the witnesses' dishonesty, it is obligated to act.

Nearly every Plaintiff denied seeing weapons, disguises and protective gear in the Leftist mob, but the Court and the jury clearly saw these items in evidence.

An early draft of this document attempted to go through witness testimony, first of the weapons being denied, then the weapons being showed to the Plaintiff in evidence. Unfortunately, in text this becomes tedious with a lot of skipping around in video pointing at a screen, that this format cannot do justice. Cantwell will cite video exhibits, and insert one photograph where the weapons are seen.

39

Ms. Romero and Mr. Willis are featured in Exhibit CCEX140A with a woman illegally open carrying a firearm at University of Virginia, and a man carrying pepper spray in his right hand with the black glove.



But, when questioned about it…

22 N. Romero – Direct

Q Did you see anyone with you, that was with you that evening, that had weapons, mace, or any objects to throw?

A That was with me? Uh-uh. No.

- Plaintiffs' Exhibit 3207, the video Ms. Sines took before and during the car crash.

- Plaintiffs' Exhibit 0313

40

- Plaintiffs' Exhibit 1360

- Plaintiffs' Exhibit 0297

Those videos (and others) capture the Leftist mob before it was hit by Mr. Fields's car. This mob was walking down the street chanting "Antifascista!" with weapons. But the Plaintiffs' all described the mob as peaceful and unarmed, at least, until they were shown the weapons in the video, at which point they simply denied knowing about it at the time. But a gang of armed criminals violating a dispersal order and attacking vehicles with weapons does not a peaceful joyous crowd make.

Nearly all Plaintiffs likewise denied hearing the "Antifascista!" chant. Even Ms. Sines, who was recording the video as the chant was loudly going on all around her.

In the case of Ms. Sines, she denied seeing weapons, masks, and protective gear that she recorded all around her, even as the video was played before her eyes in open Court. She denied hearing the "Antifascista!" chant which she recorded herself, and which no reasonable person can believe she or the people in her company missed, due to its overwhelming volume, and the great number of people in the crowd chanting it.

But despite this roaring war cry, every Plaintiff in the mob who was asked, denied hearing it, and denied having any knowledge of Antifa being present.

41

The black Antifa flag was also prominently featured in Plaintiffs' Exhibit 0291

(Red arrow added for purposes of this document to identify the flag)



And, tellingly, Plaintiffs' financiers at "Integrity First for America" conspicuously excluded this exhibit from their publicly searchable database of evidence, when they went to brag about their supposed victory in this case.

📄 **Photo of August 12, 2017**
**EXHIBIT #0271 | PDF**

📄 **Photo of August 12, 2017**
**EXHIBIT #0273 | PDF**

▶ **Clip of video recording of Marissa Blair video**
**EXHIBIT #0297A | MP4**

📄 **Photo of James Fields' car after car attack**
**EXHIBIT #0300 | PDF**

*Figure 1https://www.integrityfirstforamerica.org/exhibits?*

Exhibit #0297A is a video of the car crash, so Plaintiffs can spare us the line about traumatizing people by publishing the truth.

This is consciousness of guilt.

Seth Wispelwey's testimony was so dishonest, that the jury refused to pay him for it. So, as amusing as it may be, we won't spend much time on his perjury. But, he too denied knowing anything about Antifa, even when confronted with his Tweets that said "Jesus is Antifa" and his blog post in Slate (CCEX52) where he stated that "battalions" of Antifa came ready to brawl with their "community defense tools".

These are only the most obvious examples of the Plaintiffs attempting to deceive the Court, the jury, and the public. Less obvious ones include Devin Willis denying that he knows Emily Gorcenski, then referring to Gorcenski, who is transgender, as "they" in the singular form (so as to avoid gendered language).

Q Did you hear somebody say, "there's a fucking lot of them"?

A I don't remember that.

Q You don't remember that.

Okay. Do you know who Emily Gorcenski is?

**A I don't. I've heard of her name, but I don't know who she is, or who they are.**

Q Who they are?

A I'm just sensitive to people's pronouns.

Q I understand. So first you said you don't know who she is, and then you said you don't know who they are, right?

A Well, on the off-chance I had misgendered her, I wanted to correct that.

Q Do you know what Gorcenski's gender is?

A I don't.

Q You don't know if Gorcenski is transgender?

A I do not.

44

Emily is a common enough female name to make a female inference, and the rest of Willis's testimony shows he has no problem using "he" and "she" to refer to human beings. Willis knows exactly who Gorcenski is, and that he lied about it shows consciousness of guilt.

Willis, Romero, and Baker (at least) all denied knowing who told them about the events in dispute. Willis also resisted giving up the names of the people he was with on August 11th, and denied knowing any identifying characteristics about two of them even after the Court told him he had to give up the names. He is covering for his co-conspirators, and his detected lies should undermine the credibility of those not detected.

Romero displayed her dishonesty as described earlier when she, in the moment, began then recanted an accusation against Cantwell for assaulting her. Her answers were so evasive that the Court had to intervene repeatedly.

This section could go on forever. The testimony of the Plaintiffs was broadly dishonest and evasive and contradicted by audio video evidence. This Court is obligated not to carry out injustice through force of law. If the Court does not dismiss the claims outright, it should order a new trial on all counts due to incredible witness testimony to avoid being party to this dishonesty.

## 9. Excessive Damages Are Evidence of the Jury's Improper Motive, and the Court's Rewriting of the Plaintiffs' Claims on Count 5 was Improper.

Cantwell and his co-defendants sufficiently successfully argued that Virginia law limits punitive awards to $350,000 per action, not per Plaintiff, and that nothing about this case would allow the District Court to flout that law. The Plaintiffs now appeal that decision.

Defendants also argued that the punitive to compensatory ratio was unconstitutional on Count 3. The District Court rejected this argument, and held all Defendants liable for Count 5, which wasn't even a claim against any Defendant but Fields. If the Jury wanted to hold all the Defendants liable for Mr. Fields's car wreck, they would have done so by making them share in the compensatory damages.

The Jury knew full well that Mr. Fields, who is spending the rest of his life in prison, was never going to be able to pay a penny of this. If the Jury thought the entire slate of Defendants were liable for Mr. Fields's car wreck, they would have been sure that people not spending the rest of their lives in prison would have compensated Fields's alleged victims for the damages they suffered.

In addition, Cantwell reiterates his arguments above that without a finding on Counts 1 and 2, the Court cannot conclude that the Plaintiffs were found liable for

racially motivated violence on Counts 3 and 4. The Jury's instructions on Counts 3 and 4 allowed them to find liability for racially motivated harassment. The Jury asked if "words are a form of violence" before concluding their deliberations, indicating there was discussion of finding the Defendants liable for Counts 1 and 2 on words alone, but could not come to agreement on that absurd premise. The Plaintiffs' racially inflammatory case and prejudicial witnesses caused the racially stacked Jury to attach liability to the Defendants for their words. This was reflected in the compensatory to punitive damages ratio on Count 3, in which there were no damages to compensate, because the Defendants' demonstration did not harm anyone, but the jury punished the Defendants with punitive damages anyway, because they disagreed with Defendants' political views and demonstration.

This is an improper motive. Even if it were proper, the District Court improperly shoehorned other Defendants into Fields's liability on Count 5, and this Court has an obligation to correct it.

## 10. The District Court Erred in Stating that Cantwell Presented No Evidence That He Could Not Pay.

Cantwell also argued that he was unable to pay. In the District Court's judgement, it erroneously stated that Cantwell had not offered evidence of this. In fact,

47

Cantwell had submitted numerous sworn affidavits and an IFP application to the District Court, all of which, like Cantwell's other motions, the Court ignored.

Specifically, to Cantwell, he is unable to pay any of this. He was driven into poverty by Plaintiffs' calumny before his arrest in January of 2020, causing his lawyers to move to withdraw as counsel twice. His financial situation has not improved while he spent the last three years in prison. It is not likely to improve in the near future, and it is certain not to improve if Kaplan carries through on her repeated public vows to use this case to haunt Defendants for the rest of their lives.

Cantwell cannot pay his persecutors anything, much less anything resembling the verdict, and certainly not the $14+ million in attorney fees they were recently awarded. The Court knew this, and committed a profound injustice with every cent awarded to the Plaintiffs from Cantwell.

## 11. Plaintiffs Should Not Be Allowed To Collect Attorney Fees or Costs For A Case They Failed To Prove

Plaintiffs spent years slandering Defendants in the press and wasting millions of donor dollars to prove a violation of federal civil rights laws prohibiting racially motivated violent conspiracy. Their failure to prove that case is reflected in the deadlock on Counts 1 and 2.

Their hate speech reparations consolation prize on the remaining counts does not entitle them to now obtain duplicates of those fraudulently obtained, and subsequently wasted donor dollars, from the Defendants.

If the Plaintiffs' financiers had told the public they were suing the Defendants for harassment, they would not have raised the millions they did, they would not have spent those millions, and they would not now be trying to recover them, because the trial would never have happened. Since the Jury did not find a racially motivated violent conspiracy on Counts 1 and 2, it is nonsense to suggest they found one on Counts 3 and 4, for reasons already explained above.

In a decision posted to the District Court's docket just prior to this filing, Judge Hoppe ordered Defendants joint and severally liable for over $1.2 Million in attorney fees and costs for Plaintiffs' extravagant spending on their abuse of their discovery powers. In it, he erroneously stated that no Defendant objected to this.

Cantwell objected repeatedly to any award to Plaintiffs and their counsel in any amount for any reason, and specifically argued that he ought not be held liable for his codefendants' failures to comply with discovery.

Judge Hoppe also erroneously stated that all the Defendants failed to comply with discovery. Cantwell did nothing of the sort. Cantwell gave the Plaintiffs all they were entitled to and then some. Plaintiffs falsely claimed he was not complying

USCA4 Appeal: 23-1125     Doc: 27     Filed: 03/20/2023     Pg: 49 of 55

because they had not found evidence of claims they knew were untrue. Their fishing expedition through his devices and accounts produced nothing they found useful enough to produce at trial that Cantwell had not provided on his own voluntarily.

A million here, a million there, and eventually you might cause a problem for a man who had nothing when he still had a successful business on August 11th 2017. That he has been completely ruined by this fraud is so abundantly clear that it is difficult to comprehend the District Court's decisions regarding Cantwell's indigence.

## In Conclusion

This case is fake. The Jury's verdict and the District Court's decisions are a stain on the American legal system that this Court has an opportunity to correct.

Cantwell's defense was specifically and uniquely prejudiced by the misconduct of the Plaintiffs in their decision not to keep him apprised of these proceedings for 14 months. The misconduct of his captors during that time compounded the problem, and the District Court knew about this and declined to intervene. Giving the Plaintiffs a gift of a severance was not a remedy to this problem, and Cantwell did not waive his rights by objecting to it.

The Plaintiffs sued for a racially motivated violent conspiracy, and they failed to prove this claim as evidenced by the deadlock on Counts 1 and 2. The Plaintiffs cannot collect a consolation prize on Counts 3 and 4 because Defendants were not sued under other theories of liability available under Counts 3 and 4.

Only James Fields was sued on Count 5, and for the District Court to hold all Defendants liable on this Count is improper.

The Plaintiffs lied under oath, egregiously and repeatedly while video contradicted their lies in open Court.

The Plaintiffs' expert witnesses were improperly admitted, and this error was all the more egregious against Cantwell specifically owing to Plaintiffs' misconduct and that of his captors, preventing him from knowing about their existence until after the Court ruled on their admissibility. Cantwell's subsequent transfers and the Court's refusal to grant Cantwell a continuance proved prohibitive of Cantwell adjusting his defense to account for this improper testimony.

The Court's instructions that deposition testimony was inadmissible against Cantwell was insufficient to cure the prejudice this caused to his defense. Cantwell was accused of participating in a conspiracy, and evidence of the conspiracy is evidence against Cantwell. These things cannot be separated by a Jury instruction.

51

The Plaintiffs understood this, which is why they included testimony specifically mentioning Cantwell in their deposition designations.

The Jury acted on improper motives, as evidenced by the excessive damages in light of their not finding a racially motivated violent conspiracy. The Jury asked if "words are a form of violence" indicating that they held Defendants liable for words on those counts they did reach a verdict on, and that at least one Juror thought words alone were cause to find the Defendants liable on Counts 1 and 2 as well.

The District Court continues to act as if it does not read what Cantwell submits thereto, as evidenced by the decisions stated there is no evidence that Cantwell cannot pay damages or fees, and that Cantwell did not comply with discovery, and that Cantwell did not object to Plaintiffs' demands for attorney fees and costs.

If this case stands, it will not be the Defendants who suffer so much as it will be this Country.

No matter what this Court does, the Defendants are screwed for life. We have made enemies more powerful than we can hope to defeat within our lifetimes, and they will persecute us until we are dead.

Then they will persecute our children.

We accept this as the cost of doing the right thing in a fallen world.

This Court needs to act not to protect the evil white supremacist cartoon villains featured in the Plaintiffs' absurd filings, but to protect its own reputation, and that of the American legal system

Respectfully Submitted,

Christopher Cantwell

March 14th 2023

-------------------------------------------------------------

RECEIVED

2023 MAR 20 PM 2: 25

U.S. COURT OF APPEALS
FOURTH CIRCUIT

This package is made from post-consumer waste. Please recycle - again.

**PRESS FIRMLY TO SEAL**

**PRESS FIRMLY TO SEAL**

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED



UNITED STATES
POSTAL SERVICE ®

**PRIORITY** ®
**MAIL**

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.

** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

# FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

RECEIVED
U.S. MARSHALS

# TRACKED ■ INSURED

To schedule free Package Pickup, scan the QR code.



USPS.COM/PICKUP

PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2



US POSTAGE & FEES PAID    062 50014850061
PRIORITY MAIL              9746840
ZONE 4 FLAT RATE ENVELOPE  FROM 03104
ComBasPrice

stamps
endicia
03/18/2023

## PRIORITY MAIL 2-DAY™

CHRISTOPHERCANTWELL.COM
497 HOOKSETT ROAD
UNIT 312
MANCHESTER NH 03104

SHIP
TO:   CLERK PATRICIA S CONNOR
      US COURT OF APPEALS 4TH CIRCUIT
      1100 E MAIN ST STE 501
      RICHMOND VA 23219-3538

### USPS TRACKING #

9405 5112 0623 8999 2545 87

Order: No. 231125

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; July 2022; All rights reserved.